**In re SMARTALK TELESERVICES, INC. SECURITIES LITIGATION.**

**This Document Relates To:**

**All Actions Particularly:**

**USDC Massachusetts Case No.: 99CVH11499EFH (5S Trust I) 99 CVH11662EFH (Grillo) USDC S.D. Ohio Case No.: C2–98–814**

**No. 00–1315.**

United States District Court, S.D. Ohio, Eastern Division.

Nov. 1, 2000.

506

Greg May, Munsch Hardt Kopf Harr & Dinan, Dallas, TX, Evans L. Land, Ann E. Bennington, Sidney Williams, Hahn Loeser & Parks, Columbus, OH, Darryl Paul Rains, San Francisco, CA, for Smartalk Teleservices, Inc.

Richard Stuart Wayne, Strauss & Troy, Cincinnati, OH, Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, for Richard A. Eckstein.

Marilyn Ruth Donoff, M R Domoff and Associates, Dayton, OH, Maribeth Deavers, Lionel Z. Glancy, Lionel Z. Glancy Law Offices, Los Angeles, CA, for Allison Mizraji.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Kevin P. Roddy,

Milberg Weiss Bershad Hynes & Lerach, Los Angeles, CA, Stephen Richard Basser, Barrack Rodos & Bacine, San Diegao, CA, for Sidney Weinstein.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Kurt B. Olsen, Kurt Olsen Law Offices, Washington, DC, for Charles R. Ostroff.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Richard S. Schiffrin, Schiffrin Craig & Barroway, Bala Cynwyd, PA, for Gerald Tobin.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Jeffrey H. Squire, Kaufman Malchman Kirby & Squire, New York City, for Patricia Bartolomeo.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Stanley Grossman, Pomerantz Haudek Block & Crossman, New York City, for David Jaroslawicz.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Robert N. Kaplan, Kaplan Kilsheimer & Fox, New York City, for David Turf.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Joel Sanford Taylor, Anthony J. Celebrezze, Jr., Dinsmore & Shohl, Columbus, OH, Kenneth A. Sweder, Sweder & Ross, Boston, MA, for Victor Grillo, Jr., Lloyd Lapidus, DTR Associates, Inc.

Maribeth Deavers, Martin Pergram & Browning, Worthington, OH, Daniel R. Karon, Robert N. Kaplan, Kaplan Kilsheimer & Fox, New York City, for Lisa Ernst.

Boris Feldman, Bredhoff & Kaiser, Washington, DC, Keith Eggleton, Wilson Sonsini Goodrich & Roseati, Palo Alto, CA, Sidney Williams, Hahn Loeser & Parks, Columbus, OH, for Robert H. Lorsch.

Boris Feldman, Bredhoff & Kaiser, Washington, DC, Sidney Williams, Hahn Loeser & Parks, Columbus, OH, for Erich L. Spangenberg, Glen Andrew Folck, Richard Teich, David A. Hamberger.

Sidney Williams, Hahn Loeser & Parks, Columbus, OH, for Robert M. Smith, Fred F. Fielding, Ahmed O. Alfi, Wayne V. Wooddell.

Thomas Leslie Long, Baker & Hostetler, Columbus, OH, for Amre Younesss, Lisa Marino.

John Joseph Kulewicz, Vorys Sater Seymour & Pease, Columbus, OH, for Pricewaterhousecoopers LLP.

John Joseph Kulewicz, Vorys Sater Seymour & Pease, Columbus, OH, for Pricewaterhousecoopers LLP.

Joel Sanford Taylor, Dinsmore & Shohl, Columbus, OH, Kenneth A. Sweder, Sweder & Ross, Boston, MA, for Smartalk Partners.

## OPINION AND ORDER # 1

SARGUS, District Judge.

This matter is before the Court on Defendant PricewaterhouseCooper's ("PwC") Motions to Dismiss the various Complaints in this consolidated action For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART PwC's Motions. A detailed description of the Court's ruling on the Motions considered herein is provided at the end of this opinion.

### I. Background.

Plaintiffs acquired stock in SmarTalk Teleservices Inc. ("SmarTalk") which later filed for bankruptcy. Plaintiffs have filed suit against SmartTalk's officers and directors and SmarTalk's accountants PwC. The claims against PwC arise from the fact that PwC performed various accounting services for SmarTalk, including auditing financial statements for fiscal years 1996, 1997 and for the first three quarters of 1998. After issuing "clean" audit opinions for the financial statements for year 1997 and part of 1998, PwC disclosed to SmarTalk that there were a number of accounting errors included in those statements. When SmarTalk announced these

findings to the public, its stock plummeted in value and eventually SmarTalk filed for bankruptcy in January 1999. The Plaintiffs are SmarTalk stockholders who allege that PwC committed securities fraud and/or was negligent in its role as auditor for SmarTalk.

Although all of the Plaintiffs were SmarTalk stockholders, they are divisible into two groups, distinguished by the manner in which they acquired the stock. Some of the Plaintiffs acquired SmarTalk stock on the open market (the "Class Plaintiffs").[1] The rest of the Plaintiffs acquired the stock in connection with SmarTalk's acquisitions of specific companies (Worldwide Direct, Inc. and SmarTel Communications, Inc.) whose stock the Plaintiffs owned (the "WWD Plaintiffs" and the "SmarTel Plaintiffs").

The Class Plaintiffs consist of all persons, other than the defendants and their affiliates, who purchased or otherwise acquired SmarTalk securities between August 13, 1997 and January 7, 1999 (the "Class Period") excluding those persons who acquired SmarTalk notes during a September 1997 offering and those persons who purchased or otherwise acquired notes in connection with SmarTalk's acquisitions during the Class Period. (Class Complaint at ¶ 1). The Class Plaintiffs allege that they relied on PwC's misrepresentations associated with its audits of SmarTalk's financial statements beginning in the second quarter of the fiscal year ending 1997 up through the third quarter of 1998. (Class Complaint at ¶ 2).

The WWD Plaintiffs consist of persons who received shares of SmarTalk stock on or about June 10, 1998 via SmarTalk's stock for stock acquisition of Worldwide Direct, Inc. ("WWD"). The WWD Plaintiffs also consist of DTR Associated Limited Partnership and DTR Associates, Inc. (collectively "DTR"). DTR was the distributor and marketing arm of WWD.

DTR received SmarTalk stock on July 1, 1998 when SmarTalk purchased DTR in a cash and stock transaction. The WWD Plaintiffs allege that they would not have entered these agreements but for the misrepresentations contained in PwC's audit opinion of the 1997 financial statements.

The SmarTel Plaintiffs were each shareholders in SmarTel Communications, Inc. ("SmarTel."). In May 1997, SmarTel was purchased by SmarTalk in a stock for stock transfer. The SmarTel Plaintiffs allege that they entered this transaction in reliance on PwC's audit of SmarTalk's 1996 financial statements (the only statements at issue in these actions that were not formally restated.) (SmarTel Complaint at ¶¶ 76, 78, 79, 128, 139–150). A subset of the SmarTel Plaintiffs are the founders of SmarTel: Jonathon, Craig and Clifford Slater ("the Slaters"). The Slaters have additional claims arising from an April 1998 Agreement by which the Slaters and SmarTalk settled an employment dispute arising from the employment agreements they had signed as part of the SmarTel acquisition. (*Id.* at ¶¶ 91–115, Exh. E). A portion of the consideration for the April 1998 Agreement was SmarTalk stock. The Slaters allege that they entered April 1998 Agreement in reliance on PwC's misrepresentations in its audits of the 1997 financial statements and the financial statements for the first quarter of 1998. (*Id.* at ¶¶ 120,130,158–200).

The Class Plaintiffs have asserted against PwC a claim under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). The SmarTel Plaintiff have asserted similar 10(b) claims (SmarTel Complaint Counts I, IV) and negligent misrepresentation claims (SmarTel Complaint Counts III, VI ) against PwC. The WWD Plaintiffs have also asserted against PwC a 10(b) claim (Count I), a common law fraud claim (Count II), a negligence claim (Count III), a negligent misrepresen-

---

1. The Court has stayed class certification pending its resolution of the Defendants' Motions to Dismiss. The case presently before this Court is not a class action but is instead a consolidation of many cases.

tation claim (Count IV), and a claim for punitive damages (Count V). PwC has moved to dismiss all of these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. General Standards Regarding Motion To Dismiss.

### A. Standard For Granting Rule 12(B)(6) Motion.

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the nonmovant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mayer v. Mylod,* 988 F.2d 635, 637 (6th Cir.1993). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall,* 898 F.2d 1196, 1199 (6th Cir. 1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there is no law to support the claims made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint.

### B. Standard for Pleading Securities Fraud.

As with all fraud claims, allegations of securities fraud must satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). Rule 9(b) requires that fraud be pleaded with particularity. "To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentations(s) upon which he relied." *See Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir. 1984). Although the Rule 9(b) permits the pleading of a condition of mind generally, allegations of fraudulent misrepresentation must be made with a sufficient factual basis to support an inference that they were knowingly, or recklessly made. *See Coffey v. Foamex L.P.,* 2 F.3d 157, 161 (6th Cir.1993); *Stevelman v. Alias Res. Inc.,* 174 F.3d 79, 84 (2d Cir.1999).

With respect to statutory securities fraud claims, The Private Securities Litigation Reform Act of 1995 ("PSLRA") supplements the pleading standard set forth in Rule 9(b). The Sixth Circuit Court of Appeals has summarized the effect of PLSRA as follows:

Despite the application of the Rule 9(b) heightened pleading requirement to securities fraud cases, the Supreme Court recognized long ago that "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739–44, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). As the Court then observed, groundless claims of securities fraud tended to delay the normal business activities of a corporate defendant while the plaintiff conducted extensive discovery of business documents in the hopes of finding relevant evidence. *See id.* at 741, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.

In 1995, Congress concluded that Rule 9(b) had "not prevented abuse of the securities laws by private litigants." H.R. Conf. Rep. No. 104–369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818. Indeed, Congress echoed the concerns expressed by the Supreme Court in *Blue Chips,* noting that frivolous securi-

ties fraud litigation "unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud." S.Rep. No. 104–98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690. On December 22, 1995, over the objection of the President, Congress amended the Securities Act through passage of the PSLRA. See Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67 (1995).

The PSLRA amendments to the Securities Act require the following:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (1998). The PSLRA provides that if a plaintiff does not meet this requirement, a court may, on any defendant's motion, dismiss the complaint. See 15 U.S.C. § 78u–4(b)(3) (1998). As courts have observed, the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss. See, e.g., In re Glenayre Techs. Inc. Sec. Litig., 982 F.Supp. 294, 298 (S.D.N.Y.1997). Indeed, the PSLRA "nowhere defines what the 'required state of mind' is for any of the kinds of actions that might be brought" under the Securities Act. In re Baesa Sec. Litig., 969 F.Supp. 238, 240 (S.D.N.Y.1997).

In re Comshare Inc., 183 F.3d 542, 548–49 (6th Cir.1999). Thus, the PSLRA is an attempt to limit the cost of securities fraud cases on the securities industry by requiring that plaintiffs in such actions either plead facts sufficient to give rise to a "strong inference" of the necessary scienter or else have their claims dismissed on the pleadings.

## III. Analysis of Motions to Dismiss.

### A. 10b Claims.

Defendant PwC moves to dismiss all of Plaintiffs' 10b and 10b–5 claims for failure to state a claim upon which relief can be granted.[2] "To state a claim under § 10(b) of the Securities and Exchange Act of 1934 ("Securities Act") and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plain-

2. Section 10(b) provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

tiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare*, 183 F.3d at 548. (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991).)

The primary issue raised by PwC's motion is whether the Plaintiffs have pleaded scienter with sufficient specificity. For the most part, the who, what, when, and where typically at issue in securities fraud cases is not at issue here. Instead, except as noted below, PwC asserts that the claims made by the Plaintiffs are insufficient to properly allege the requisite scienter.

### 1. Standard For Pleading Scienter in Security Fraud Cases.

The parties rely on *In re Comshare*, 183 F.3d 542 (6th Cir.1999) to define the standard for pleading scienter and the definition of scienter. *In re Comshare* was a consolidated securities fraud action arising from Comshare's restatement of certain financial statements after the company acknowledged that the original financial statements contained revenue recognition errors. The errors were based on a subsidiary's violation of company policy and generally accepted accounting principles ("GAAP") that proscribed the inclusion in financial statements of revenue from sales that were not assured. The subsidiary had been recognizing revenues from sales that were conditioned by side letter agreements allowing the buyer to back out of the sale under certain circumstances. When Comshares discovered the side letter agreements, it was forced to announce that it had overstated its recognized revenue causing the market value of its stock to drop significantly. The plaintiff-shareholders brought claims of securities fraud under § 10(b) and based such claims on the restated financial statements and on bare allegations of motive and opportunity.

The district court granted the defendants' motion to dismiss the claims finding that the plaintiffs had failed to plead facts establishing a "knowing misrepresentation" by the defendants. The Court of Appeals affirmed the district court but rejected the lower court's rationale, adopting a more lenient standard for scienter, a standard that the plaintiffs had nonetheless failed to satisfy.

Specifically, the *Comshare* Court held that:

> we conclude that plaintiffs may plead scienter in § 10b or Rule 10b–5 cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud. Consequently, we must reject the reasoning of the district court to the extent it concluded that plaintiffs must "plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants" in order to establish a defendant's scienter in a securities fraud case brought under § 10(b) or Rule 10b–5.

183 F.3d at 549. Thus, to survive a motion to dismiss, plaintiffs are not required to "allege facts giving rise to a strong inference of knowing misrepresentation or intent." 183 F.3d at 552. Rather, "plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of *reckless behavior* but not by alleging facts that illustrate *nothing more* than a defendant's motive and opportunity to commit fraud." 183 F.3d at 551 (emphasis added).[3]

The Sixth Circuit defined "recklessness" as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have

---

**3.** The Sixth Circuit's point with respect to motive and opportunity is subtle. The statute requires scienter for liability and not just motive and opportunity: nonetheless, allegations

of motive and opportunity may "on occasion" give use to an inference of scienter. 183 F.3d at 551.

known of it." 183 F.3d at 550. This definition demonstrates that recklessness is beyond negligence because it must be "highly unreasonable conduct" and an "extreme departure" from standards of ordinary care creating a danger that is "so obvious that any reasonable man would have known of it." On the other hand, reckless behavior is not intentional or knowing behavior because the danger need not have been actually known. As between negligence and intent, the Court made clear that recklessness is closer to intent than it is to negligence. 183 F.3d at 550, n. 7 ("recklessness ... is far from negligence and closer to a lesser form of intent.")

The standard for recklessness in securities fraud cases is more onerous when the claim is brought against an outside auditor. *See, e.g., Reiger v. Altris Software, Inc.* No. 98–CV–528 TW JFS, 1999 WL 540893 (S.D.Cal. April 30, 1999). The *Reiger* case involved factual circumstances very similar to the circumstances alleged here: shareholders sued the outside auditor, among others, alleging securities fraud based on the company's multiple accounting errors revealed in a significant restatement of financial statements that created a substantial drop in stock price. The *Reiger* court summarized the standard for recklessness applied to auditors in these circumstances:

> The recklessness standard imposes an even heavier burden on plaintiffs seeking to add outside auditors and accountants as defendants in a securities fraud action. In the context of an accounting firm, the Ninth Circuit has observed that
>
>> [t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter ... Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an

egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*[In re] Worlds of Wonder [Secs. Litig.],* 35 F.3d [1407] at 1426 [(9th Cir.1994)]; *accord In re Software Toolworks, Inc.,* 50 F.3d 615, 628 (9th Cir.1994) ("Software Toolworks" ); *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992). Thus, recklessness on the part of an independent auditor entails a mental state so culpable that it "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 121 (2d Cir.1982); *Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335, 1341 (9th Cir.1980) (auditor's recklessness "must come closer to being a lesser form of intent [to deceive or defraud] than merely a greater degree of ordinary negligence.") (internal quotations omitted).

When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud. *Hollinger [v. Titan Capital Corp.],* 914 F.2d [1564] at 1570 [(9th Cir.1990)]; *Software Toolworks,* 50 F.3d at 628. The clearest way a plaintiff can satisfy this burden is to identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately, recklessly, or by failing to follow generally accepted accounting and auditing principles. *See, e.g., In re Health Management, Inc. Sec. Litig.,* 970 F.Supp.

192, 203 (E.D.N.Y.1997) (plaintiff adequately stated securities fraud claim against auditor who failed to follow proper audit procedures and ignored specific information indicating that client had overstated its accounts receivable); *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, \*11–13 (S.D.N.Y. Mar. 1, 1999) (plaintiff adequately stated securities claim against auditor who violated auditing principles, relied on facially deficient and forged documents, and relinquished control of aspects of the audit to audited company). 1999 WL 540893 \*4–5. This Court agrees that to allege that an independent accountant or auditor acted with scienter, the complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly.

### 2. Applications of the Scienter Standard to the alleged GAAP and GAAS Violations.

With several exceptions noted below, all of the Plaintiffs' claims are based on the fact that PwC audited SmarTalk's financial statements for 1997 and the first three quarters of 1998 and issued audit opinions representing that the statements were in compliance with generally accepted accounting principles ("GAAP") and that the audit had been conducted in accordance with generally accepted auditing standards ("GAAS"). Subsequently, at PwC's behest, SmarTalk announced that the financial statements had a number of accounting errors and issued restated financial statements. As a result, the value of SmarTalk's stock dropped significantly. Each of the Plaintiffs allege virtually the same GAAP and GAAS violations. (*See* Class Complaint at ¶¶ 40–79; SmarTel Complaint at ¶¶ 160–200; WWD Complaint at ¶¶ 68–98).

In addition, the SmarTel Plaintiffs base portions of their claims on the fact that PwC audited SmarTalk's financial statements for 1996. As noted above, these statements were never restated; however, the SmarTel Plaintiffs allege that the financial statements failed to comply with GAAP and that PwC's audit failed to comply with GAAS. Consequently, the SmarTel Plaintiffs allege that PwC's "clean" audit opinion contained false representations to the contrary. Although the Court returns to this issue below, for the purposes of the SmarTel Plaintiffs' 10(b) claim, the Court shall simply assume that the Plaintiffs' allegations are true.

PwC moves to dismiss the Plaintiffs' claims arguing that the Plaintiffs have not satisfied the scienter pleading requirement. PwC asserts that Plaintiffs have alleged nothing more than a failure to follow GAAP and GAAS, which is, by itself, insufficient to state a securities fraud claim. The Court agrees.

The Sixth Circuit has held that a failure to follow GAAP is, by itself, insufficient to establish scienter for a securities fraud claim. *In re Comshare*, 183 F.3d at 553 (citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 (1st Cir. 1994); *Fine v. American Solar King Corp.*, 919 F.2d 290, 297–98 (5th Cir.1990)). However, the Sixth Circuit also has suggested that such failures are relevant when combined with allegations to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did. *In re Comshare*, 183 F.3d at 553. This Court interprets this suggestion consistent with the standard enunciated by *Reiger*: GAAP and GAAS violations are relevant to show an auditor's scienter when the complaint also identifies specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and alleges that these facts were ignored, either deliberately or recklessly.

The Court has reviewed each of the Complaints in detail and concludes that, except as noted below, the Complaints fail to adequately allege scienter based on the

numerous accounting errors set forth therein. These errors, although sufficient to plead negligence on the part of an auditor, are insufficient as a matter of law to state a claim for securities fraud under 10(b) against an auditor.[4] Apart from the GAAP and the GAAS violations, the Plaintiffs have failed to allege any specific, highly suspicious facts and circumstances available to PwC that demonstrate PwC engaged in highly unreasonable conduct constituting an extreme departure from the standard of ordinary care or disregarded a danger so obvious that any reasonable person would have known of it.

The question is not whether the accounting errors were serious; the issue is whether those errors were known, or should have been known, to PwC at the time they were issued. The errors were, in the first instance, caused by SmarTalk. As to PwC, there is simply no allegation that supports an inference, let alone a strong inference, that PwC acted with a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company or that the danger was so obvious that any ordinary person would have been aware of the Company's fraud. "Plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). In the absence of a specific factual basis on which to conclude that PwC should or could have discovered the errors, the Court concludes that the Plaintiffs have failed to adequately plead scienter against PwC. The allegations in the Complaints are, for the most part, an example of pleading fraud in hindsight, the exact type of claims that the Rule 9(b) and the PSLRA were designed to weed out at the pleading stage. This Court refuses to conclude that allegations of an auditor's failure to discover accounting errors alone is sufficient to create a strong inference of recklessness. *See SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992) (noting that the recklessness standard in securities fraud actions "requires more than a misapplication of accounting principles.")

Plaintiffs argue that they have alleged more than a simple failure to discover accounting errors. Specifically, Plaintiffs argue that they have alleged (1) facts that show that PWC knew or could have known of the violations of GAAP, (2) facts that audit procedures set forth in GAAS should have alerted PwC to the violation earlier than they actually did, and (3) facts that illustrate "red flags" that should have put PwC on notice of the violation of GAAP or at least would have given PWC reason to question the accounting underlying the GAAP violations. The Court addresses these arguments in order.

■ Plaintiffs argue that because GAAP allows restatements only when the material accounting irregularities existed at the time the financial statements were prepared, the fact that SmarTalk issued a restatement indicates that the irregularities could have been known by PwC at the time the audit was performed. This argument fails because it would necessarily allow a finding of scienter based on every restatement based on GAAP violations in direct contradiction of the pleading rules announced by the Sixth Circuit. Allegations that a subsequent revelation of the falsehood of previous statements implies scienter lack merit, since "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *In re Comshare*, 183 F.3d at 553–54 (citing *Stevelman v. Alias Res., Inc.*, 174 F.3d 79, 84 (2d Cir.1999).) Plaintiffs' contention confuses the theoretical possibility of knowledge with the standard for reckless-

---

4. To clarify, the Court concludes that the allegations in this case are sufficient to allege negligence. It does not hold that all violations of GAAP and/or GAAS are always sufficient to show negligence.

ness enunciated by the Sixth Circuit. The accounting errors must be so obvious that any reasonable person would have been aware of them.

■ Next, Plaintiffs rely on their allegation that the Ohio PwC audit team caught the GAAP violations almost immediately after replacing the California PwC audit team. Plaintiffs argue that this fact indicates that the latter team should have known of the violations when it conducted its audit. To a certain extent, it is not unreasonable to infer that the less time it takes another set of accountants to discover a mistake the more obvious the mistake was. Nonetheless, this fact alone is not sufficient to support a "strong inference" of recklessness.

■ Plaintiffs argue that the magnitude of the accounting error, in both shear dollars and in terms of the percentage of SmarTalk's reported numbers, demonstrates that PwC should have known of the GAAP violations. In a similar vein, Plaintiffs also argue that the basic nature of the accounting errors, and the fact that the mistakes all worked to inflate SmarTalk's position also create a strong inference of scienter. The Court rejects these bases for demonstrating a strong inference of scienter because they are too general and speculative. Indeed, the Sixth Circuit rejected a similar argument that Defendants in *In re Comshare* must have known of the accounting errors because they occurred over a long period of time. 183 F.3d at 553. The Court concluded that such allegations fail to adequately support claims of securities fraud which cannot rest "on speculation and conclusory allegations." *Id.* (citing *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir.1996)). In this case, the nature and extent of the errors may create an inference of negligence on the part of the auditor, but absent allegations of specific and suspicious facts and circumstances, no inference of recklessness can be drawn.

■ The Plaintiffs also argue that the regular procedures set forth in GAAS should have alerted PWC to the violations of GAAP earlier than they actually did. An auditor's failure to follow GAAS may demonstrate negligence, but, as the Sixth Circuit has found, violations of accounting standards standing alone do not support a strong inference of recklessness. Apart from the general GAAP and GAAS violations, none of the Plaintiffs have alleged any specific facts that would qualify as "red flags" that should have alerted PwC to the accounting errors. *In re Comshare,* 183 F.3d at 553 (citing *In re Health Management Sec. Litig.,* 970 F.Supp. 192, 203 (E.D.N.Y.1997) (finding strong inference of recklessness where defendant allegedly failed to follow proper audit procedures, that GAAP violations led to material misstatements, and that the defendant ignored numerous "red flags" including (1) the defendant's failure to follow up on an analyst's letter which alerted the defendant to artificially inflated accounts receivable and (2) the defendant's failure to exercise heightened scrutiny in response the analyst's letter and an SEC inquiry regarding accounts receivable).)

The GAAS violations set forth in this case show nothing more than hindsight. At best, the Plaintiffs speculate that had PwC followed GAAS, PwC would have been aware of the GAAP violations. Again, absent from the allegations is any particular fact or document that would have come to light to show that a GAAP violation existed or at least to make the existence of a GAAP violation so obvious that any reasonable person would have known of it. In short, the Plaintiffs plead that because errors were committed, Defendants must have violated the procedures set up to catch such errors and had they not violated these procedures, they would have caught the errors. These allegations fail under the PSLRA as overly general and speculative.

■ Plaintiffs assert that PwC was motivated to misrepresent the financial status

of SmarTalk by its desire to maintain fees flowing from the relationship with its client. The Court concludes that this allegation is insufficient as a matter of law to support a strong inference of scienter. The majority of authority have held that a desire to maintain the fees flowing from a client relationship is not a sufficient basis on which to infer scienter. *See, e.g., Di-Leo*, 901 F.2d at 629; *Melder v. Morris*, 27 F.3d 1097, 1103–04 (5th Cir.1994); *Reiger*, 1999 WL 540893 at *3 (citing cases); *but see Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 191 (7th Cir.1993).

■ The closest issue raised by the Plaintiffs is their argument that PwC's failure to include a "going concern" paragraph either in the restated 1997 financial statements (filed with the SEC on November 4, 1998) or in its Report of Independent Accountants (dual dated November 4, 1998) was a reckless violation of GAAS. SmarTalk declared bankruptcy in January 1998. In support of this argument, the Plaintiffs have both identified general types of documents that PwC allegedly failed to investigate, (Class Complaint at ¶ 146(a)-(f)) and asserted that PwC did not discover the following facts: (1) between July 1998 and October 23, 1998, SmarTalk used $45 million in cash leaving only $15 million in cash at the end of October requiring insolvency by the end of December, (2) since 1997 SmarTalk had been unable to generate sufficient cash from internal operations to fund its operations and had survived only because it had obtained cash through a $150 million debt offering and a $30 million private placement, and (3) SmarTalk could not obtain long term credit because of the restatement forcing its expenses to rise and making it impossible for SmarTalk to turn a profit until 2003.

PwC counters that these allegations are nothing more than claims of fraud by hindsight and simple violations of GAAS. In addition, PwC argues that the relevant time period for an auditor's going concern analysis is one year from the date of the financial statements under audit. According to PwC, because SmarTalk did not enter bankruptcy until January 1999, more than a year from the date of the 1997 financial statements that PwC audited, Plaintiffs have not even alleged negligence.

The Court concludes that the "going concern" allegations fail to go beyond a GAAS violation. Assuming that the facts in question fell within the relevant time period for SmarTalk's "going concern" analysis, the Plaintiffs fail to identify a specific basis for concluding that PwC was aware of these facts, or should have been aware of these facts (because the facts were so obvious that any reasonable person would have known of them). Nor are there any allegations connecting the generally alleged GAAS violations to these specific facts; Plaintiffs allege no facts to show that following GAAS would have led to the discovery of this information. At most, Plaintiffs' allegations amount to a speculative attempt to connect generally stated GAAS violations with information discovered after the fact, in an attempt to create the appearance of recklessness. This attempt fails. *See Reiger*, 1999 WL 540893 at *8; *Cheney v. Cyberguard Corp.*, No. 98–6879–CIV–GOLD, 2000 WL 1140306 at *10–13, (S.D.Fla. July 31, 2000). Even under the case law cited by the Plaintiffs, this attempt is insufficient to support the Plaintiffs' argument. None of Plaintiffs cases involved claims against auditors, and, for the most part, the cases included circumstances in addition to accounting errors that indicated recklessness. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1211 (1st Cir.1996) (defendant company and officers were alleged to be in possession of information that they were under a duty to disclose in a prospectus); *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir.1995)(insider trading shows that corporate defendants knew of company's falling financial status at the time of optimistic statements).

In sum, the Plaintiffs' 10(b) and fraud claims are premised on the simple fact that

PwC audited SmarTalk's financial statements for the relevant time periods and subsequently admitted to accounting errors in those statements and its audit opinions. The Sixth Circuit and other courts have squarely held that such allegations, although possibly sufficient to plead negligence, are insufficient to establish the strong inference of scienter necessary to state a securities fraud case. Rule 9 and the PSLRA were designed to screen out such claims at the pleading stage because they amount to nothing more than fraud by hindsight.

### 3. Application of the Scienter Standard to the April–June 1998 Fraud on the WWD Plaintiffs.

■ There is one exception to the above analysis. The WWD Complaint contains allegations which, in the Court's view, are sufficient to establish a strong inference of scienter. WWD identifies a number of "red flags" that show PwC was aware of potential problems with its prior accounting treatment of SmarTalk's financial statements during the spring of 1998 when it made specific representations to WWD and its representatives in conjunction with the WWD merger negotiations.

Phillip Hirsch was the partner in charge of the SmarTalk account in the California PwC office. The WWD Complaint alleges that prior to the issuance of the 1997 financial statement, Mr. Hirsch had arranged for a job with an affiliate of one of SmarTalk's major shareholders. The Complaint alleges that this constituted a conflict of interest. (WWD Complaint at ¶¶ 36, 45c).[5] After the 1997 financial statement was released, the responsibility for the SmarTalk account was shifted to the

PwC Ohio office where PwC partner Michael Costanza took over the account. (*Id.* at ¶ 37).

When Costanza first took over the SmarTalk account, he informed SmarTalk in Ohio that PwC was actively reconsidering the positions taken in the 1997 financial statement by stating that, "we are looking at the work papers to see if we agree with the positions taken by the LA office." (*Id.* at ¶ 39). In April or May of 1998, Costanza received a PwC publication relating to the treatment of deferred revenue (the "Deferred Revenue Publication") that threw into serious question the way that SmarTalk had treated the recognition of deferred revenues in the 1997 financial statement with respect to the companies SmarTalk had acquired. (*Id.* at ¶ 40). During the same time period, Costanza announced in Ohio that he had received the Deferred Revenue Publication, and that PwC was actively reconsidering the positions taken in the 1997 financial statement.[6] Costanza was informed of the proposed merger with WWD. PwC thereupon began dealing directly with representatives of WWD and the Plaintiff in Ohio. (WWD Complaint at ¶ 41).

In May 1998, during the negotiation leading to the acquisition of WWD, WWD's accountants Deloitte & Touche spoke on the phone and face to face with PwC about the 1997 financials statements and the first quarter 1998 results. (WWD Complaint at ¶¶ 43,44). In these conversations, Costanza allegedly represented to Deloitte & Touche that PwC was "comfortable" with the 1997 financial statements, had "no issues" with the accounting treatments adopted and that the SEC had re-

---

**5.** The Court mentions these allegations because they create some inference of wrongdoing. However, the allegations are deficient in that they fail to identify the "major shareholder" or the "affiliate." For instance, if the major shareholder is Microsoft, or some other large publicly held company, for whom its holdings in SmarTalk are an insignificant "drop in the bucket" of its assets, these pleadings are irrelevant.

**6.** Although the allegations could be more clear on this point, the Court construes the allegations, as it must, to mean that Costanza was aware of this information and was actively reconsidering the positions taken in the audit of 1997 financial statements before the meetings with the WWD Plaintiffs and their representations discussed below.

viewed the accounting in the 1997 financial statements and signed off on them. (*Id.* at ¶¶ 45, 45a). In addition, Costanza represented to Deloitte & Touche that PwC had full confidence in the 1997 financials. (*Id.* at ¶ 45b).

Also, in a telephone conversation in April or May of 1998, Marc Cummins, of WWD's investment advisor Donaldson, Lufkin & Jenrette, called Costanza and specifically inquired about the soundness of the merger and acquisition accounting, the deferred revenue recognition, and the write off of in-process research development in the 1997 financial statement. (WWD Complaint at ¶¶ 46,46b). In these conversations, Costanza represented that all accounting issues had been "resolved," that PWC was "comfortable" with the accounting, and that all of these issues had been reviewed in detail by the SEC and PwC's national office. (WWD Complaint at ¶ 46, 46b).

The Court concludes that these allegations are sufficient at the this stage of the litigation to establish a strong inference that PwC was reckless in informing the WWD Plaintiffs of its confidence in the 1997 financial statements. Unlike the allegations pertaining to the accounting errors, these allegations demonstrate specific facts that tend to show that PwC had or should have had some reason to doubt the financial statements and yet went on to make statements to the contrary. To be clear, these allegations do not show that PwC knew or was aware of the accounting errors that eventually surfaced and were reported; rather, these allegations show facts from which it can be concluded that PwC was reckless, as defined above.

7. The Court notes that WWD Plaintiffs argue their negligence claim simultaneously with their negligent misrepresentation claim. Thus, the Court shall accordingly treat the two claims as co-extensive and necessarily based on the WWD Plaintiff's reliance on PwC's allegedly false representations. *See Nycal Corp.*, 688 N.E.2d at 1371, n. 4 (adopting Restatement 552 and distinguishing ordinary negligence cases governed by the "foreseeability standards of traditional tort law.");

Based on these assumptions and the above stated legal principles, the Court concludes that this portion of the WWD Complaint sufficiently states a 10b claim.

Consequently, the Court DENIES in part PwC's Motion to Dismiss the WWD Complaint as to Count I and II insofar as it relates to the April–June 1998 fraud. The Court GRANTS PwC's Motion to Dismiss the WWD Complaint as to the remainder of those Counts.

The Court GRANTS PwC's Motion to Dismiss the Class Complaint with respect to all allegations against PwC. The Court GRANTS PwC's Motion to Dismiss Counts I and IV of the SmarTel Complaint in its entirety.

## B. Negligent Misrepresentation Claims.

PwC moves to dismiss the SmarTel Plaintiffs' claim for negligent misrepresentation and the World Wide Direct Plaintiffs' claims for negligent misrepresentation and for negligence.[7] These claims raise three main issues for the Court to decide. First, whether Ohio law or Massachusetts law controls the WWD Plaintiffs' claims.[8] Second, whether the SmarTel Plaintiffs have adequately alleged that PwC made a materially false statement in its audit of the 1996 financial statements. Third, whether the WWD SmarTalk's Plaintiffs or the SmarTel Plaintiffs have alleged facts sufficient to show that PwC owed them a duty of care with respect to its statements in the relevant audit opinions.

*Haddon View Invest. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 157, 436 N.E.2d 212 (1982)(limiting account liability to third parties whose reliance on the account's representation is specifically foreseen).

8. PwC and the SmarTel Plaintiffs agree that Massachusetts law should apply to the SmarTel Plaintiffs' negligent misrepresentation claim.

### 1. Choice of Law for the State Law Claims.

The Court first addresses the choice of law issue raised with respect to the WWD Plaintiffs' claim for negligence and negligent misrepresentation against PwC. The WWD Plaintiffs base these claims on the PwC's audits of the 1997 financial statements and on the April–June 1998 statements. Plaintiffs contend that Ohio law applies to the claim; PwC contends that the claim must be considered in accordance with Massachusetts law.

In multidistrict litigation, a transferee court is to apply the choice of law rules that the transferor court would have applied. 17 James Wm. Moore et al., Moore's Federal Practice § 112.07[2][a] (3d ed.1999). Consequently, this Court will apply Massachusetts law to the matter at bar. In Massachusetts, courts resolve choice of law by assessing various choice-influencing considerations, including those delineated in the Restatement (Second) of Conflict of Laws § 148 (1971). *See Cosme v. Whitin Mach. Works, Inc.*, 417 Mass. 643, 632 N.E.2d 832, 834 (1994). This section provides:

(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflicts of Laws § 148 (1971).

In this case, WWD Plaintiffs assert that § 148(1) is the applicable choice of law provision and that, under that section, Ohio law governs Plaintiffs' negligent misrepresentation claim. Defendant PWC argues that, in light of the factual allegations made, § 148(2) applies and, further, under that section, Massachusetts law governs Plaintiffs' claim.

This Court first concludes that § 148(2) applies to the case at bar since the representations challenged by Plaintiffs occurred in more than one state. Two of the individual Plaintiffs are residents of the State of Florida. (WWD Complaint at ¶¶ 5, 7). One individual Plaintiff is a resident of the State of Massachusetts, and two corporate Plaintiffs have their principal places of business in Massachusetts. (*Id.* at ¶¶ 6, 8–9). The 1997 financial statement, upon which Plaintiffs claim they relied, was prepared in the PwC California office. (Complaint at ¶ 31). Shortly

thereafter, the SmarTalk account was shifted to the Ohio PwC office. (*Id.* at ¶¶ 36–37). The Ohio PwC partner then made further representations to Plaintiffs. (*Id.* at ¶¶ 38–39). The Ohio PWC partner then began dealing directly with Plaintiffs and their representatives in Ohio in connection with the merger transaction. (*Id.* at ¶¶ 41–42). Plaintiffs' accountants, Deloitte and Touche, also conversed with the Ohio PWC accountants in Ohio and via telephone calls to Ohio. (*Id.* at ¶¶ 43–44). Thus, on the face of the complaint, representations upon which Plaintiffs' claim is based occurred in California and Ohio and were relied upon by Plaintiffs' or Plaintiffs' representatives in Massachusetts and Ohio.

This Court concludes that Massachusetts is the state with the most significant relationship to the events and parties at issue. In considering the factors set forth in § 148(2), the Court first finds that the factors weigh in favor of Massachusetts. Three of the WWD Plaintiffs are from Massachusetts. The Court finds that they acted in reliance on the alleged misrepresentations in Massachusetts as the reliance caused Plaintiffs to sell a business that was at least partially based in that state. Further, while a number of alleged misrepresentations occurred in Ohio, the primary source of misrepresentation, the audit of the 1997 financial statements, originated in California. In sum, the Court finds that the state with the most significant relationship to the matters at bar is Massachusetts.

### 2. Alleged Misrepresentations in PwC's Audit of the 1996 Financial Statements.

PwC argues that the SmarTel Plaintiffs have failed to adequately allege that the 1996 financial statements were inaccurate. Because the Court has already concluded that the Plaintiffs' 10(b) claim fails on the scienter element, the Court must consider this issue only as it pertains to the negligent misrepresentation claim.

PwC asserts that the requirements of Rule 9(b) apply with equal force to claims for negligent misrepresentation. *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir.1997). SmarTel Plaintiffs do not dispute this and the case law cited by PwC supports it. Consequently, the Court shall apply the Rule 9(b) standards in determining whether the Plaintiffs have adequately pleaded the falsity of the 1996 financial statements.

The SmarTel Plaintiffs specifically allege that PwC, in its February 23, 1997 audit letter pertaining to the 1996 financial statements, represented that the financial statements conform with GAAP and that PwC's audit conformed with GAAS. Thus, the question for the Court is whether the SmarTel Plaintiffs have alleged why the pertinent representations are false.

The SmarTel Plaintiffs have alleged three types of accounting errors in the 1996 financial statements: (i) inflating SmarTalk's revenues by improperly treating free promotional phone cards as revenue producing phone cards, (ii) inflating earnings by improperly reporting marketing costs as capital expenses, and (iii) failing to disclose material inadequacies SmarTalk's systems of internal controls. (SmarTel Complaint at ¶¶ 137, 139–153).

PwC argues that, with respect to (i) and (ii) the Plaintiffs have failed to provide sufficient particularity as to why these 1996 financial statements were in error, and with respect to (iii) PwC argues that GAAS did not require PwC to disclose SmarTalk's lack of internal controls, citing *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 432 (6th Cir.1980); *see also Monroe v. Hughes*, 31 F.3d 772, 775 (9th Cir.1994). The Court shall address these points in order.

First, with respect to the allegations that SmarTalk improperly treated free phone cards as revenue producing cards, the Court concludes that the SmarTel Complaint contains sufficient detail as to why this practice was in error. PwC

argues that the allegations in the Complaint do not refer to any particular transaction or specify the amount of revenue improperly recognized. The allegations provide detail as to how SmarTalk accounted for revenue from the minutes of phone cards it sold, how SmarTalk's accounting method failed to distinguish between revenue producing minutes and non-revenue producing minutes, and hypothetical examples of how this problem would work to improperly overstate revenue. (SmarTel Complaint at ¶¶ 139–146). Moreover, the Complaint details how this overstatement of revenue violated GAAP. (*Id.* at ¶¶ 193–97). These allegation are sufficient to state why the financial statements contained errors and consequently why PwC's representation to the contrary was false.

Second, with respect to the allegations regarding the improper capitalization of marketing expenses, the Court concludes that the Plaintiffs have adequately alleged the basis for their assertion that the 1996 financial statements were erroneous in this respect. PwC argues that the allegations are deficient because the Plaintiffs fail to identify the amount of the marketing expenses that should have been expensed instead of capitalized, fail to identify a single transaction for which SmarTalk accounted improperly, or any particular reason why the accounting was improper for the specific transactions. Again, the Court disagrees with PwC's position. The Plaintiffs' allegations specifically identify the portion of SmarTalk's marketing and advertising fees, albeit by category and not by amount (*i.e.*, the manufacturers development funds ("MDF")) (*Id.* at ¶ 148). In addition, the Plaintiffs allege that all of the MDF was capitalized in 1996. Moreover, the Plaintiffs identify

the GAAP principle this treatment violated. Last, the Plaintiffs allege that SmarTalk's financial figures for 1997 and first two quarters of 1998 were restated because SmarTalk had improperly expensed MDF in those figures. The Court agrees with PwC that the restatement of the 1997 and 1998 accounting treatment of MDF does not show that the 1996 accounting treatment was fraudulent; however, these allegations do help to provide particularity as to why the Plaintiffs are alleging that 1996 financial statements were false.[9] The allegations do not necessarily imply, as PwC argues, that the 1996 accounting of the MDF is false because the 1997 or 1998 accounting was false; rather, a reasonable reading of the allegations is that the 1996 financial statements are false for the same reasons that PwC admitted that the 1997 and 1998 statements were false. The Court concludes that these allegations sufficiently state the bases on which the SmarTel Plaintiffs assert that the 1996 financial statements were in error and consequently that PwC's representation to the contrary was false.

Third, the Court agrees with PwC that its failure to disclose SmarTalk's lack of internal controls did not violate GAAS. Citing case law in support of its position, PwC argues that, under GAAS, it had no duty to disclose SmarTalk's lack of internal controls. Although the Plaintiffs are correct that the cases cited by PwC are decided on summary judgment or on a full evidentiary record, the cases nonetheless establish that, as a matter of law, an auditor is under no duty to disclose in an audit report deficiencies in internal controls. *See Adams v. Standard Knitting Mills, Inc.,* 623 F.2d 422, 432 (6th Cir.1980)("The [American Institute of Certified Public Accountants] impose[s] no requirement that

---

9. PwC also contends that GAAP allows marketing expenses to be capitalized in certain circumstances. This contention raises factual issues that cannot be resolved at this stage of the litigation where all favorable factual presumptions are drawn in favor of the Plaintiffs. As a final point, PwC argues in its reply brief

that the Plaintiffs ignore the "materiality" element of their fraud claim. The Court shall disregard this argument because PwC did not argue the materiality element in their Memorandum in support of their Motion, focusing instead on falsity.

the notes to the certification of financial reports contain a ... disclosure of such [internal control] weaknesses."); *In Re Worlds of Wonder Secs. Litig.* 35 F.3d 1407, 1417 (9th Cir.1994). Although the Plaintiffs have alleged that PwC should have reported the internal control deficiencies to SmarTalk's audit committees, this allegation, even if true, is irrelevant because PwC was under no duty to mention in its audit report that it had spoken to the audit committee about such issues. *See Monroe v. Hughes,* 31 F.3d 772, 774–75 (9th Cir.1994)("Neither applicable professional standards nor any legal authority of which we are aware, however, treat deficiencies in internal controls of a company as material to the audit report itself."). Thus, even if PwC failed to report such deficiencies to SmarTalk's audit committee, such failure is not a basis for concluding that PwC misrepresented that its audit report complied with GAAS. Consequently, the Court agrees with PwC that PwC's failure to report internal control concerns in its audit report for the 1996 financial statements does not serve as a basis for concluding that PwC's representation that its report complied with GAAS was false. Nevertheless, because the Court has concluded that the Plaintiffs have adequately alleged two other misrepresentations in the audit report, the report can serve as a basis for the SmarTel Plaintiffs's negligent misrepresentation claim.

### 3. PwC's Duty of Care.

PwC argues that the Plaintiffs do not have standing to sue PwC because they are not PwC's clients and because PwC is not alleged to have intended that the Plaintiffs would rely on PwC's audit opinions. Plaintiffs argue that as investors in SmarTalk's acquisition targets, they were the intended beneficiaries of the pertinent audit opinions and therefore, PwC's Motion should be denied.

Massachusetts law on the scope of an accountant's duty to non-clients is set forth in *Nycal Corp. v. KPMG Peat Marwick*

*LLP,* 426 Mass. 491, 688 N.E.2d 1368 (1998). *Nycal* involved an action by a company that purchased a controlling block of shares in Gulf Resources & Chemical Corporation ("Gulf") against Gulf's accountants. Gulf had retained the defendants to audit its 1990 financial statements. During the course of its audit, the defendants became aware of two attempted hostile takeovers of Gulf and of the Gulf board's resistance to those takeovers. After the defendant's audit report became publicly available, Gulf began to negotiate with Plaintiffs for the purchase of a large block of Gulf stock. Gulf provided Plaintiff with the audit report as part of these negotiations, but the defendants did not learn of the transaction until two days before the closing and after the stock purchase agreement had been signed. The lower court granted summary judgment to the defendants concluding that the defendants did not owe the plaintiffs a duty of reasonable care when they prepared the audit report.

The Supreme Judicial Court of Massachusetts affirmed the lower court, adopting the Restatement Second of Torts § 552 as the appropriate analysis for determining the scope of an auditor's duty of care for claims of negligent misrepresentation brought by persons other than the auditor's clients. Under the Restatement approach, an auditor may be liable to a third party for a negligently rendered audit opinion only if the third person was "a person or one of a limited group of persons for whose benefit and guidance [the auditor] intends to supply the information or knows that the recipient intends to supply it." Restatement § 552(2)(a). The Court in *Nycal* clarified the rule as follows:

> The better reasoned decisions interpret § 552 as limiting the potential liability of an accountant to noncontractual third parties who can demonstrate actual knowledge on the part of accountants of the limited—though unnamed—group of potential third parties that will rely upon the report, as well as actual knowledge

of the particular financial transaction that such information is designed to influence. [quotations and citations omitted]. The accountants knowledge is to be measured at the moment the audit report is published, not by the foreseeable path of harm envisioned by litigants years following the unfortunate business decision.

688 N.E.2d at 1372–73. Thus, an auditor may be liable for negligent misrepresentation claims only when (1) at the time the report is published the auditor has actual knowledge of (2) the limited group of potential third parties who will rely on the report and (3) of the particular financial transaction that such information is designed to influence.

In *Nycal*, the Court found in favor of the defendants because at the time the report was published (1) the defendants did not, indeed could not, know of the transaction in question, (2) the defendants did not know that the report would be used to locate a purchaser (especially given the known resistance to the takeover attempts), and (3) the audit report was prepared for no other contemplated purpose than inclusion in Gulf's annual report. The circumstances alleged in this action stand in stark contrast to the circumstances in *Nycal*.

 According to the WWD Complaint, while undertaking the audit of the 1997 financial statement, PWC understood from discussions with SmarTalk management that SmarTalk was seeking to acquire phonecard companies and was particularly seeking to acquire cellular phonecard companies. (*Id.* at ¶ 30). Indeed, in the first quarter of 1998, while the audit for the 1997 financial statement was being conducted by PwC, the CEO and the CFO of SmarTalk met and spoke with PwC personnel, including Philip Hirsch, Nicole Ford, and Christopher Bryce to discuss PwC acquisition plans. The PwC personnel were informed about the need for SmarTalk to develop a prepaid cellular telephone solution and about

the targeting for acquisition of WWD, which SmarTalk had begun to "court" in January of 1998, and which was only one of three or four national prepaid cellular companies. (*Id.* at ¶ 31a).

The allegations in the SmarTel Complaint are similar, albeit more general, than the WWD Plaintiffs' allegations. The SmarTel Plaintiffs have alleged that PwC, as SmarTalk's accountant and auditor, had access to SmarTalk's business records and information. (SmarTel Complaint at ¶¶ 62–65). In addition, the SmarTel Plaintiffs allege that PwC was aware of SmarTalk's acquisition strategy, that SmarTel was the first target of that strategy and that the negotiations to acquire SmarTel pursuant to that strategy were going on during the audit of the 1996 financial statements. (*Id.* at ¶¶ 72–81, 215–216). In the Court's view, these allegations could support a reasonable inference that PwC had actual knowledge of the SmarTel Plaintiffs as a limited group of investors who would rely on the audit reports for the particular financial transaction in question.

In sum, unlike the defendants in *Nycal*, at the time that the pertinent reports were published in this case, PwC had reason to know of the transactions in question with the target companies in question. Nonetheless, the difficult question, in both the SmarTel case and the WWD case, is whether, from the allegations, it may be inferred that PwC knew that the Plaintiff would rely on its audits of the financial statements. The Court has strongly considered the fact that all of the audit letters referred to in the Plaintiffs' pleadings were either public documents prepared for the purposes of SmarTalk's SEC filings or else prepared for the Board of Directors for SmarTalk. However, given the allegations in both Complaints, the Court is not prepared to say, as a matter of law, that PwC did not know that these documents would be reasonably relied upon by the SmarTel or WWD Plaintiffs. Thus, this Court distinguishes the *Nycal* Court's statement that annual audits prepared for

no particular purpose creates no duty to third parties. *See Nycal,* 688 N.E.2d at 1373–74. Reasonable minds could conclude from the allegations that the annual audits at issue here were prepared for another purpose, that being the influencing of the transactions in question. This is especially true in light of the standard that requires the Court to draw all reasonable inferences in favor of the Plaintiffs. This inference may, of course, be refuted at the summary judgment stage or at the trial on this matter.

The Court also concludes that factual allegations regarding the April—July 1998 statements by PwC partner Costanza to the WWD Plaintiffs and/or their representative also satisfy the elements of negligent misrepresentation.

■ The allegations in the SmarTel Complaint with respect to the Slaters and the 1998 Agreement are, however, deficient. The allegations in the Complaint fail to show how PwC had "actual knowledge of the particular financial transaction" in question or that PwC had actual knowledge of the Slaters as a limited group of third parties who would rely on the audit letters. Rather it appears that the Slaters were "unknown, unidentified potential future investor[s]" in SmarTalk. *Nycal,* 688 N.E.2d at 1373. Thus, the Court GRANTS PwC's Motion to Dismiss Count IV of the SmarTel Complaint insofar as that Count pertains to PwC.

Otherwise, the Court DENIES PwC's Motions with respect to the WWD Plaintiffs claims for negligence or negligent misrepresentation and with respect to the SmarTel Plaintiffs' remaining claim for negligent misrepresentation.

### D. WWD Plaintiffs' Fraud Claim and Punitive Damages Claims.

■ Defendants move to dismiss the WWD Plaintiffs common law fraud claim because they argue that the Plaintiffs have

failed to allege scienter with the requisite particularity.[10] For the reasons stated above, the Court rejects PwC's position with respect to the April–June 1998 *Fraud* but accepts PwC's position with respect to the remainder of WWD Plaintiff's fraud claim. Thus, for the reasons stated above, the Court DENIES PwC's motion to dismiss the WWD Plaintiffs' common law fraud claim in so far as those claims arise from the April–June 1998 Fraud. The Court GRANTS PwC's Motion to Dismiss as to the remainder of that claim.

■ The Court GRANTS PwC's Motion to Dismiss the WWD Plaintiffs' claim for punitive damages. As stated above, the Court has concluded that Massachusetts law applies. The Defendant's are correct that Massachusetts law does not permit the recovery of punitive damages unless such damages are authorized by statute. No Massachusetts statute authorizes the recovery of punitive damages for common law fraud claims. *See Santana v. Registrars of Voters of Worcester,* 398 Mass. 862, 502 N.E.2d 132, 135 (1986); *Computer Sys. Engineering, Inc. v. Qantel Corp.,* 571 F.Supp. 1365, 1370 (D.Mass. 1983). Consequently, the Court GRANTS PwC's Motion to Dismiss the WWD Plaintiffs claim for punitive damages.

### IV. Conclusion.

The Court GRANTS PwC's Motion to dismiss the Class Complaint in so far as it relates to PwC.

The Court **GRANTS IN PART** and **DENIES IN PART** PwC's Motion to Dismiss the WWD Complaint. The Court **DENIES** that Motion as to Count I and II of the WWD Complaint insofar as these Counts relate to the April–June 1998 fraud. The Court **GRANTS** PwC's Motion to dismiss the WWD Complaint as to the remainder of those Counts and as to Count V. The Court **DENIES** that Motion as to Counts III and IV of the WWD Complaint.

---

**10.** Defendants originally moved to dismiss this claim for other reasons which have now been remedied by an amendment of the WWD Plaintiff's First Amended Complaint.

The Court **GRANTS** PwC's Motion to Dismiss Counts I and VI of the SmarTel Complaint. The Court **DENIES** PwC's Motion to Dismiss Count III of the Smar-Tel Complaint.

Because the Court cannot conclude that amendment will remedy the defects that have been identified, all the dismissals are with prejudice. For the sake of a completing the record, the Court **ORDERS** the WWD Plaintiffs to file a complete copy of their Second Amended Complaint within thirty (30) days of the date of this Order.

**IT IS SO ORDERED.**